UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------x   Case No. 1:24-cv-03278-NRB
LORENZO ROBERT SAVAGE III,

                Plaintiff,

     - against -

NYP HOLDINGS, INC. d/b/a NEW YORK POST,
MIRANDA DEVINE, and JONATHAN LEVINE,

                Defendants.
--------------------------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS
<u>COMPLAINT</u>**

**LAW OFFICE OF MARK E. GOIDELL**
*Attorney for Plaintiff*
666 Old Country Road, Suite 700
Garden City, New York 11530
(516) 683-0001
mark@goidell.com

## <u>TABLE OF CONTENTS</u>

Table of Authorities ........................................................................**Error! Bookmark not defined.**

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 2

    Procedural History ...................................................................................................... 2

    Factual Allegations ..................................................................................................... 3

    The Tweets .................................................................................................................. 4

    The Article .................................................................................................................. 5

ARGUMENT ..................................................................................................................... 7

POINT I ............................................................................................................................. 7

STANDARDS FOR MOTION TO DISMISS ................................................................... 7

POINT II ............................................................................................................................ 8

THE TWEETS AND ARTICLE ARE REASONABLY SUSCEPTIBLE TO A PLAUSIBLE
DEFAMATORY MEANING ............................................................................................ 8

    New York Law Applies ............................................................................................... 8

    General Standards For Determining Defamatory Meaning ......................................... 8

    The Defamatory Meaning Of The Publications Is Readily Apparent ........................ 10

        The Fabricated Text Messages ............................................................................. 16

POINT III ......................................................................................................................... 17

PLAINTIFF SHOULD BE GRANTED LEAVE TO AMEND THE COMPLAINT ......... 17

CONCLUSION ....................................................................................................... 19

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allen v. CH Energy Group, Inc.*,
    58 A.D.3d 1102 (3d Dep't 2009) ........................................................................9, 14

*Alphonse Hotel Corporation v. Tran*,
    828 F.3d 146 (2d Cir. 2016) ....................................................................................8

*Armstrong v. Simon & Schuster, Inc.*,
    85 N.Y.2d 373 (1995) ..............................................................................8, 10, 15

*Aronson v. Wiersma*,
    65 N.Y.2d 592 (1985) ............................................................................................10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................7

*Ava v. NYP Holdings, Inc.*,
    64 A.D.3d 407 (1st Dep't 2009) ............................................................................11

*Belencser v. Orange County Publications, Division of Ottaway Newspapers, Inc.*,
    116 A.D.2d 696 (2d Dep't 1986) ...........................................................................11

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ...........................................................................................7, 8

*Ben-Oliel v. Press Pub. Co.*,
    251 N.Y. 250 (1929) ..............................................................................................16

*Celle v. Filipino Reporter Enterprises Inc.*,
    209 F.3d 163 (2d Cir. 2000) ..............................................................................9, 13

*Chau v. Lewis*,
    935 F.Supp.2d 644 (S.D.N.Y. 2013) .....................................................................11

*Chiavarelli v. Williams*,
    256 A.D.2d 111 (1st Dep't 1998) ..........................................................................14

*Clevenger v. Baker Voorhis & Co.*,
    8 N.Y.2d 187 (1960) ..............................................................................................16

*Crespo v. Franco*,
    2024 WL 4188356, No. 22-cv-7345-PKC (S.D.N.Y. Sept. 13, 2024) ....................................3

*Davis v. Brown*,
    211 A.D.3d 524 (1st Dep't 2022)..............................................................................15, 16

*Geraci v. Probst*,
    15 N.Y.3d 336 (2010) ...............................................................................................9

*Goldfarb v. Channel One Russia*,
    663 F.Supp.3d 280 (S.D.N.Y. 2023).......................................................................15

*Golub v Enquirer/Star Group, Inc.*,
    89 N.Y.2d 1074 (1997) ...............................................................................................9

*Henry v. Fox News Network LLC*,
    629 F.Supp.3d 136 (S.D.N.Y 2022)..........................................................................17

*Hinsdale v Orange County Publications, Inc.*,
    17 N.Y.2d 284 (1966) .............................................................................................17

*Hope v Hearst Consolidated Publications, Inc.*,
    294 F.2d 681 (2d Cir. 1961), *cert. denied* 368 U.S. 956 (1962).............................13

*Jacob v. Lorenz*,
    626 F.Supp.3d 672 (S.D.N.Y. 2022)........................................................................15

*James v. Gannett Co., Inc.*,
    40 N.Y.2d 415 (1976)...................................................................................................9

*Joyce v. Thompson Wigdor & Gilly LLP*,
    2008 WL 2329227, No. 06-cv-15315-RLC-GWG (S.D.N.Y. June 3, 2008) .........................14

*Julian v American Business Consultants, Inc.*,
    2 N.Y.2d 1 (1956) ....................................................................................................13

*Karedes v. Ackerley Group, Inc.*,
    423 F.3d 107 (2d Cir. 2005).....................................................................................10

*Leser v. Penido*,
    62 A.D.3d 510 (1st Dep't 2009)...............................................................................16

*Levin v. McPhee*,
    119 F.3d 189 (2d Cir. 1997).....................................................................................15

*LoanStreet, Inc. v. Troia*,
    2023 WL 5836237, No. 21-cv-6166-NRB (S.D.N.Y. Sept. 8, 2023)................................10, 12

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*,
   797 F.3d 160 (2d Cir. 2015)................................................................18

*Lunney v. Prodigy Service Company*,
   94 N.Y.2d 242 (1999) ......................................................................16

*Lynch v. City of New York*,
   952 F.3d 67 (2d Cir. 2020)..................................................................8

*McCarthy v. Dun & Bradstreet Corp.*,
   482 F.3d 184 (2d Cir. 2007)..............................................................18

*Mencher v. Chesley*,
   297 N.Y. 94 (1947) ..........................................................................14

*Netzer v. Continuity Graphic Associates, Inc.*,
   963 F.Supp. 1308 (S.D.N.Y. 1997) .....................................................9

*November v. Time Inc.*,
   13 N.Y.2d 175 (1963) ......................................................................10

*Obra Pia Ltd. v. Seagrape Investors LLC*,
   2021 WL 1978545, No. 19-cv-7840-RA (S.D.N.Y. May 18, 2021) ......................18

*Palin v. New York Times Co.*,
   940 F.3d 804 (2d Cir. 2019)..................................................................9

*Rall v. Hellman*,
   284 A.D.2d 113 (1st Dep't 2001)........................................................16

*Scacchetti v. Gannett Co., Inc.*,
   90 A.D.2d 985 (4th Dep't 1982) .........................................................14

*Scott v. Cooper*,
   215 A.D.2d 368 (2d Dep't 1995) ........................................................14

*Staehr v. Hartford Financial Services Group, Inc.*,
   547 F.3d 406 (2d Cir. 2008)...........................................................2, 3

*Thoubboron v. Convery*,
   306 A.D.2d 521 (2d Dep't 2003) ........................................................14

*Wassermann v. Haller*,
   216 A.D.2d 289 (2d Dep't 1995) ........................................................14

*Winter v. Pinkins*,
   2016 WL 1023319, No. 14-cv-8817-RKS (S.D.N.Y March 8, 2016) .....................18

*Yantha v. Omni Childhood Center, Inc.*,
    2013 WL 5327516, No. 13-cv-1948-ARR-JMA (E.D.N.Y. Sept. 20, 2013) ........................16

**Statutes**

Fed. R. Civ. P. 12(b)(6)........................................................................................................2, 3, 7

Fed. R. Civ. P. 15(a)(2)............................................................................................................18

## PRELIMINARY STATEMENT

Defendants published tweets (the "Tweets") and an article (the "Article") which falsely reported that plaintiff intervened upon the request of "officials" in Washington, D.C. to surreptitiously extricate Hunter Biden, the son of Joseph Biden, from a night of drug use while patronizing a prostitute, and falsely attributed a series of text messages to plaintiff in furtherance of this secret mission.

Defendants contend that the Tweets and the Article actually depict plaintiff in a favorable light. They argue that in the Tweets, plaintiff is "portrayed as the personification of law and order, called back into service to stop the illegal conduct of Joe Biden's wayward son." (Defendants' Memorandum of Law [ECF 26], pp. 2, 3). The Article, Defendants argue, constitute "innocuous" reports that plaintiff "had ties" to Hunter Biden, and that text exchanges between plaintiff and Hunter Biden, allegedly found on Hunter Biden's laptop, demonstrate that plaintiff "once provided critical assistance to Hunter Biden." (*Id.*).

Defendants ask the Court to read these publications in a vacuum and ignore their context. Fair-minded readers understood the publications to express or imply that plaintiff acted as a rogue vigilante – that he misused his power and influence as a former high ranking law enforcement officer to obtain favorable and unauthorized treatment for the son of the then former Vice President. The depiction of plaintiff both as a person who misused his position, and separately, as a political partisan, can and did cause substantial harm to plaintiff in his profession as a private security contractor, which requires a reputation of honesty and integrity, the absence of political or other bias, and relative anonymity to attract and conduct business.

Indeed, the public reports of the bogus text messages and misconduct attributed to plaintiff were sufficient to prompt Rep. James Comer, a high-ranking Congressman who was and is the

1

chairman of the House Oversight Committee, to publicly announce an official investigation into the perceived abuse of power by the United States Secret Service ("USSS" or "Secret Service") in extending unauthorized favors to the Biden family.[1] Only the defendants ascribe anything "laudatory" to plaintiff arising from the conduct falsely reported by defendants.

Based on the strained reading advocated by defendants, they move to dismiss the Complaint, primarily arguing that the publications are not susceptible to a defamatory meaning. Defendants are incorrect. The publications set forth a plausible defamatory meaning(s) and the defendants' motion to dismiss must therefore be denied.

## STATEMENT OF FACTS

### *Procedural History*

Plaintiff commenced this action on April 30, 2024 by filing the Complaint, [ECF 1], alleging a single count of defamation per se.

On August 12, 2024, defendants filed a pre-motion letter expressing their intent to move to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). [ECF 14]. The sole ground for dismissal set forth in the pre-motion letter was that the publications were not susceptible to a defamatory meaning. Plaintiff responded by letter dated August 14, 2024, [ECF 15], in which plaintiff contended that the defamatory meaning of the publications was readily apparent and constituted defamation per se, and alternatively, it constituted defamation per quod in light of the widespread publicity of the fabricated text messages prior to the publications.

By Order dated September 10, 2024 [ECF 16], the Court provided plaintiff with leave to

---

[1] *See*, e.g., https://www.foxnews.com/media/top-republican-calls-investigation-secret-services-bizarre-actions-help-hunter-biden. The Court is permitted to take judicial notice of news reports, rather than the facts set forth therein. *Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 424-25 (2d Cir. 2008). Other reports and broadcasts depicted plaintiff as an unsavory and rogue "fixer."

amend the Complaint "if … he can assert additional allegations to cure any alleged deficiencies **raised by defendants' letter**…" (emphasis added). Plaintiff did not amend the Complaint.[2]

### *Factual Allegations*

The facts are taken from the relevant allegations of the Complaint and from the Tweets and Article, [ECF 1-2 and 27-1], and from public news reports about which the Court is empowered to take judicial notice.[3]

Plaintiff is a highly-decorated and long-time former Secret Service agent who was in charge of the USSS Los Angeles Field Office from 2015 until November 2017. (Complaint ¶¶ 12-14). In that capacity, plaintiff "oversaw all Secret Service protective, investigative, and protective intelligence operations conducted by that office, including three resident offices located in Riverside, Santa Ana, and Ventura, California." (*Id.* ¶ 15). He retired from the Secret Service in April 2018. (*Id.* ¶ 12).

Defendant NYP Holdings, Inc. ("NYP" or the "Post") publish a well-known daily newspapers known as the New York Post, and owns, operates, and publishes articles and columns on its website, www.nypost.com. (*Id.* ¶6). Defendants Miranda Devine ("Devine") and Jonathan Levine ("Levine") are reporters for the Post. (*Id.* ¶¶ 7-8). Devine also publishes posts from her Twitter (now known as "X") account, @mirandadevine. (*Id.* ¶ 7).

---

[2] As set forth below, plaintiff conditionally requests leave to amend the Complaint to allege special damages and other limited relevant circumstances, but only if the Court determines that the allegations of the Complaint are insufficient to plausibly allege that the publications are reasonably susceptible to a defamatory connotation.

[3] *See Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 424-25 (2d Cir. 2008) (court can take judicial notice of the content of public reporting for the fact of their existence and not for the truth of their contents); *Crespo v. Franco*, 2024 WL 4188356, at *4, No. 22-cv-7345-PKC (S.D.N.Y. Sept. 13, 2024) ("The Court may take judicial notice of public documents such as news articles and public reports for the fact that they were published but not for the truth of the statements therein.").

***The Tweets***

On September 1, 2023, Devine posted a series of tweets from her Twitter account reviving fabricated, non-existent text messages between plaintiff and Hunter Biden, and portraying them as facts and news.

Specifically, Devine first tweeted the false statement that plaintiff was "featured prominently" on "Hunter Biden's laptop." [ECF 27-1]. Devine then tweeted about "[t]he scene," which she described as Hunter Biden's "bender" while purchasing the services of a prostitute using a credit card "linked to his dad's account." (*Id*.). She tweeted that funds were drained from that "account," and that immediately after, ("Nek Minnit"), "there's a freshly retired Secret Service agent downstairs demanding that Hunter let him in." (*Id*.). Devine falsely identified plaintiff, whose contact information, she falsely alleged, appeared in the infamous Hunter Biden laptop. (*Id*.). Devine then displayed a screenshot of the fabricated text exchange between plaintiff and Hunter Biden, with excerpted quotes in another tweet. (*Id*.). The full series of Devine's tweets of September 1, 2023 are annexed to the Declaration of Robert D. Balin as Exhibit 1. [ECF 27-1].[4]

The fabricated text messages, with each text alternately attributed first to plaintiff and then to Hunter Biden, read as follows:

> H – I'm in the lobby come down. Thanks, Rob.
>
> 5 minutes
>
> Come on H, this is linked to Celtic's account. DC is calling me every 10. Let me up or come down. I can't help if you don't let me H.
>
> I promise be right down. Sorry.
>
> Dales here. He a going to front desk call and tell them to give us a key now H. As your friend we need to resolve this in the immediate. Call the front desk now H or I will have to assume you are in danger and we will have to

---

[4] Excerpts from the Tweets are annexed to the Complaint. [ECF 1-1].

make them give us keys.

Really Rob I am coming down right now. I really promise. Was in bathroom buddy. Coming right this second.

We're at your door. Open it.

***The Article***

On the very next day, September 2, 2023, the Post published a story co-authored by Devine and Levine in which defendants repeat many of the false accusations set forth in the September 1, 2023 Tweets from the preceding day. (Complaint, ¶ 27). The Article headline reads, "Secret Service agent whose name appeared on Hunter Biden laptop bribed by Real Housewife: suit." The Article falsely states that plaintiff "had ties to Hunter Biden," and a caption to a photograph falsely states that plaintiff "once provided critical assistance to Hunter Biden." [ECF 1-1]. Further, the Article falsely reports that "Text messages labeled as being from [plaintiff] were reportedly found on the first son's abandoned laptop." (*Id.*). A copy of the Article is attached to the Complaint as Exhibit B. [ECF 1-2].

The Tweets and Article repeated many earlier widespread false reports that the text messages attributed to plaintiff were found on Hunter Biden's laptop, and which identified plaintiff as a Secret Service agent formerly in charge of the Los Angeles Field Office. (Complaint, ¶ 20-24). In fact, those text messages were fabricated, the attribution of the text messages to plaintiff was fabricated, and the fabrications were readily apparent even upon a cursory review. (*Id.* ¶¶ 24-25).

The Tweets, including the image of the fabricated text messages, and the Article, individually and in combination, set forth several false allegations. ***First***, they falsely report that plaintiff intervened at the hotel with Hunter Biden while working in his official capacity on the "Celtic's account." In fact, at that time, Savage was not employed as a Secret Service agent and

5

he retired the preceding month, after being inactive for several months before that. In fact, plaintiff was not requested to intervene or investigate by anyone. ***Second***, the publications falsely reports or imply that plaintiff used his alleged position to end the "binge" in which Hunter Biden was engaged. In fact, Savage was never in contact with Hunter Biden, did not intervene, and did not engage Hunter Biden that night or at any other time. ***Third***, the publications falsely attribute a series of text messages to plaintiff, during which plaintiff texted Hunter Biden and "threaten[ed] to break into [his] room, telling him that 'DC is calling me every 10,' and that he was working on 'Celtic's account' – the Secret Service codename for Joe Biden when he was Vice President." In fact, Savage did not engage in any text messages with Hunter Biden then or at any other time, did not receive calls from "DC," and was not working on the "Celtic's account." (*Id*. ¶¶ 28-29).

Defendants were actually aware of the falsity of these allegations or defendants recklessly disregard the truth. (*Id*. ¶¶ 25, 31).

The publications have caused plaintiff to suffer both general and special damages, including but not limited to lost business opportunities for his private security business. (*Id*. ¶¶ 42, 44).[5]

***Public Reporting***

In the aftermath of the revived public reporting of the text messages and intervention falsely attributed to plaintiff, Rep. James Comer, Chairman of the United States Congressional House Oversight Committee, announced an investigation into what he characterized as the "bizarre" conduct of the USSS, specifically identifying the (false) reports of plaintiff's May 2018

---

[5] If the Court determines that special damages must be alleged, plaintiff requests that the Court grant leave to file an amended complaint which specifies the economic harm caused by the defendants' publications. (*See* Point III, below, and the Declaration of plaintiff Lorenzo Robert Savage III).

alleged interaction with Hunter Biden: "There are numerous instances where the Secret Service came and tried to bail Hunter out when he was in a jam, when he was in California and getting in all kinds of trouble, getting kicked out of a very exclusive hotel there… So there was about a two-and-a-half-year period there where the American people weren't providing Secret Service protection for the Bidens, yet there are numerous instances where the Secret Service always showed up to try to help Hunter Biden. It's bizarre." [6]

Rep. Comer's comments followed a well-publicized report of the bogus text messages attributed to plaintiff, popularly  known as the "Marco Polo Report," published online in October 2022, which falsely reported that the text messages attributed to plaintiff were found on Hunter Biden's laptop computer.[7]

## **ARGUMENT**

## **POINT I**

## **STANDARDS FOR MOTION TO DISMISS**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To present a plausible claim, the "pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Twombly*, 550 U.S. at 555 (quotation marks

---

[6] https://www.foxnews.com/media/top-republican-calls-investigation-secret-services-bizarre-actions-help-hunter-biden, reproduced as Exhibit A to the Declaration of Mark E. Goidell.
[7] *See* https://archive.org/details/report-on-the-biden-laptop-marco-polo-9624/page/292/mode/2up?view=theater, pp. 250-251, reproduced as Exhibit B to the Declaration of Mark E. Goidell.

omitted). The facts alleged must be enough "to raise a right to relief above the speculative level."
*Id.*

The Court "is required to accept all well-pleaded factual allegations in the complaint as true." *Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020) (quotation marks omitted). Nevertheless, well-pleaded factual allegations must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

Regarding the sufficiency of pleading defamation claims, the New York Court of Appeals has "recognize[d] as well a plaintiff's right to seek redress, and not have the courthouse doors closed at the very inception of an action, where the pleading meets a minimal standard necessary to resist dismissal of a complaint." *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 379 (1995).

Here, plaintiff sufficiently alleges a plausible defamation claim against the defendants, including that the publications are reasonably susceptible to a defamatory meaning(s).

## POINT II

### THE TWEETS AND ARTICLE ARE REASONABLY SUSCEPTIBLE TO A PLAUSIBLE DEFAMATORY MEANING

*New York Law Applies*

Plaintiff agrees with defendants that for the purpose of determining this motion to dismiss, the Court should apply the law of the State of New York. *Alphonse Hotel Corporation v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) ("Under New York choice-of-law rules, where the parties agree that a certain jurisdiction's law controls, this is sufficient to establish choice of law.") (quotation marks and alteration omitted).

*General Standards For Determining Defamatory Meaning*

"Under New York law a defamation plaintiff must establish five elements: (1) a written

defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019).

A statement is defamatory if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of the plaintiff in the minds of a substantial number of the community. *Golub v Enquirer/Star Group, Inc.*, 89 N.Y.2d 1074, 1076 (1997). Statements that tend to disparage a person in his or her profession or business are defamatory per se without the necessity of alleging or proving special damages. *Geraci v. Probst*, 15 N.Y.3d 336, 344 (2010) ("Damages will likewise be presumed for statements that charge a person with committing a serious crime or that would tend to cause injury to a person's profession or business."). Similarly, allegations imputing incompetence or unfitness for a plaintiff's trade or profession are defamatory per se. *See*, e.g., *Allen v. CH Energy Group, Inc.*, 58 A.D.3d 1102, 1103 (3d Dep't 2009) (false statement by plaintiff's employer that plaintiff, a customer service representative, defecated on sidewalk outside of employer's office is defamatory per se).

"Whether a statement is susceptible of a defamatory meaning is a threshold question of law to be resolved by the court. If the statement complained of is susceptible of more than one meaning, at least one of which is defamatory, the claim must go to the jury." *Netzer v. Continuity Graphic Associates, Inc.*, 963 F.Supp. 1308, 1324 (S.D.N.Y. 1997). "If the statement is susceptible of only one meaning the court must determine, as a matter of law, whether that one meaning is defamatory. If the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood." *Celle   v.  Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 178 (2d Cir. 2000) (internal citations and quotation marks omitted);

9

*see also James v. Gannett Co., Inc.*, 40 N.Y.2d 415, 419 (1976) ("If the contested statements are reasonably susceptible of a defamatory connotation, then it becomes the jury's function to say whether that was the sense in which the words were likely to be understood by the ordinary and average reader.") (quotation marks omitted).

In determining whether statements are reasonably susceptible to a defamatory connotation, "the court must give the disputed language a fair reading in the context of the publication as a whole." *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 380 (1995). Challenged statements are not to be read in isolation but must be read as the average reader would against the "whole apparent scope and intent" of the writing. *November v. Time Inc.*, 13 N.Y.2d 175, 178 (1963). "The words must be construed in the context of the entire statement or publication as a whole, [and] tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction." *Aronson v. Wiersma*, 65 N.Y.2d 592, 593-94 (1985). With equal emphasis, "courts are not to strain to interpret such writings in their mildest and most inoffensive sense to hold them nonlibelous" *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 114 (2d Cir. 2005) (citation and quotation marks omitted). This Court has reiterated that principle. *LoanStreet, Inc. v. Troia*, 2023 WL 5836237, at *11, No. 21-cv-6166-NRB (S.D.N.Y. Sept. 8, 2023) ("Courts should not strain to interpret such writings in their mildest and most inoffensive sense to hold them nonlibelous"). (quotation marks omitted).

Here, defendants strain to find a non-defamatory connotation.

### The Defamatory Meaning Of The Publications Is Readily Apparent

The Tweets and Article taken as a whole are readily susceptible to a defamatory meaning. At a minimum, the gist of the publications is that (i) plaintiff misused his authority as a retired

Secret Service agent to extract Hunter Biden from difficulty, (ii) plaintiff provided unauthorized protection and services to Hunter Biden, (iii) plaintiff unethically attempted to cover up the personal affairs of the son of Joe Biden by improperly intervening in a seemingly official capacity, and/or (iv) plaintiff surreptitiously undertook an unauthorized protective assignment following his retirement. The publications depict plaintiff as a rogue law enforcement officer in the performance of ex-officio political or personal favors, who disregarded protocols and lines of command to protect the son of the former Vice President of the United States. Contrary to defendants' contention, the defamatory meaning of the publications as they relate to Mr. Savage is not strained but is instead readily understood by a typical reader. It is defendants' contention that is strained. At a minimum, there are alternative readings that require denial of the motion to dismiss.

In their argument, defendants violate the fundamental principle that the publications must be read in their full context, as the average reader would read them. The words are to be construed in the context of the publications as a whole, and "'in the same way that the reading public, acquainted with the parties and the subject matter would take [them].'" *Chau v. Lewis*, 935 F.Supp.2d 644, 657 (S.D.N.Y. 2013), *quoting Sydney v. MacFadden Newspaper Pub. Corp.*, 242 N.Y. 208, 214 (1926).[8] This context requires that the Tweets and Article be read together, in the context of each other, rather than in isolation. *See*, e.g., *Belencser v. Orange County Publications, Division of Ottaway Newspapers, Inc.*, 116 A.D.2d 696, 696 (2d Dep't 1986) (three newspaper articles read together to establish link through which articles were of and concerning plaintiff).

---

[8] In determining whether the statement is reasonably susceptible of a defamatory meaning, the court must examine not only the particular words claimed by the plaintiff to be defamatory but the entire communication in which those words appeared. The court must also read the alleged defamatory words against the background of their issuance, giving due consideration to the circumstances underlying the publication of the communication in which the words appeared. Thus, the context in which the allegedly defamatory statement was made is critical. *Ava v. NYP Holdings, Inc.*, 64 A.D.3d 407, 413 (1st Dep't 2009) (internal citations omitted).

From their narrow perspective, defendants argue that the Tweets and the Article are limited to the following allegations: (1) Hunter Biden engaged in a hooker and drug-fueled "bender" at a Los Angeles hotel; (2) Hunter Biden attempted to make multiple payments to a prostitute using a bank account(s) linked to Joseph Biden; (3) officials in Washington, D.C. asked plaintiff, a retired USSS agent, to investigate; (4) plaintiff's contact information was stored on Hunter Biden's laptop; and (5) plaintiff put an end to Hunter Biden's binge. (Defendants' Memorandum of Law, p. 12). Defendants assert that the publications "show Savage laudably stopping Hunter's illegal conduct." (*Id*. p. 13).

Defendants conveniently omit the false attribution of text messages to Savage and their content, which express that he was working – without authority – for then former Vice President Joe Biden, at a time when Hunter Biden had no USSS protection and while Savage was retired. The fair inference from these facts, disregarded by defendants, is that plaintiff was acting as a rogue pseudo-cop operating surreptitiously for the private benefit of one person and/or his family.

The Tweets and Article, co-authored by Devine, and published merely one day apart, supplement each other and provide a synergistic defamatory gist. The Tweets falsely allege that plaintiff was "featured prominently" on "Hunter Biden's laptop," and then falsely alleges plaintiff's unauthorized intervention and attributes the fabricated text messages to plaintiff. The Article then falsely reports that plaintiff "had ties to Hunter Biden," and "once provided critical assistance to Hunter Biden." The Tweets provide the context for these false allegations – there is no mistake to the average reader that the "ties" and "critical assistance" refer to the falsely alleged unauthorized intervention as a rogue law enforcement officer providing special favors to the family of Joseph Biden.

There is nothing strained or artificial about these conclusions. In fact, the Chairman of the

United States Congressional House Oversight Committee came to similar conclusions, regardless of any partisan motivation for doing so, when he announced an investigation into what he characterized as the "bizarre" conduct of the USSS, specifically identifying the (false) reports of plaintiff's May 2018 conduct.[9] At least in federal court, a person's understanding of the meaning of a publication is appropriately considered. *Hope v Hearst Consolidated Publications, Inc.*, 294 F.2d 681, 683, 687-688 (2d Cir. 1961), *cert. denied* 368 U.S. 956 (1962) (admitting into evidence testimony of witnesses who understood publication to be of and concerning plaintiff).[10]

Even without considering reports of the opinions of others regarding the plaintiff's conduct as falsely attributed to him in the publications, the lies reported in the publications are far more than merely reasonably susceptible to defamatory connotations. By falsely imputing to plaintiff misconduct as a rogue vigilante, who engaged in unauthorized law enforcement work, and provided improper and surreptitious cover to benefit the Biden family, plaintiff's reputation as a fair, even-handed, and impartial provider of security services has been seriously undermined.[11]

A false accusation that demonstrates character traits inappropriate or inconsistent with the proper conduct of a plaintiff's business or profession is defamatory per se. "One useful rule is that a writing which **tends** to disparage a person in the way of his office, profession or trade is defamatory per se and does not require proof of special damages." *Celle*, 209 F.3d at 179 (emphasis

---

[9] https://www.foxnews.com/media/top-republican-calls-investigation-secret-services-bizarre-actions-help-hunter-biden, reproduced as Exhibit A to the Declaration of Mark E. Goidell.

[10] As noted in *Hope*, New York state courts apparently follow a minority rule that excludes consideration of such opinion evidence. *Julian v American Business Consultants, Inc.*, 2 N.Y.2d 1, 19 (1956) (witnesses precluded from testifying to their opinions regarding defamatory quality of publication).

[11] It should be self-evident that these traits are essential to the success of a provider of security services like plaintiff. In the event that the Court determines that the allegations of the Complaint are insufficient in this regard, it is respectfully requested that plaintiff be granted leave to amend the Complaint accordingly. (*See* accompanying Declaration of Plaintiff Lorenzo Robert Savage III).

in original) (internal quotation marks omitted). "Words which affect a person in his or her profession by imputing to him or her **any kind** of fraud, dishonesty, misconduct, or unfitness in conducting one's profession may be actionable." *Wassermann v. Haller*, 216 A.D.2d 289, 289 (2d Dep't 1995) (emphasis added).

Courts have consistently held that words that tend to injure a party in his or her business or profession are reasonably susceptible of a defamatory meaning. *Allen*, 58 A.D.3d at 1103 (false accusation that plaintiff, a customer service representative, defecated on sidewalk outside of employer's office is defamatory per se because it disqualifies plaintiff from reliable and credible public interaction); *Thoubboron v. Convery*, 306 A.D.2d 521, 522 (2d Dep't 2003) (press release accusing plaintiff, a former sheriff, of using an aircraft owned by the sheriff's department to take personal trips at the taxpayers' expense was defamatory); *Scott v. Cooper*, 215 A.D.2d 368, 368, 369 (2d Dep't 1995) (accusations that chief of police engaged in, among other things, "misconduct regarding his official duties" and "coverups of criminal activities" "tend[ed] to disparage [plaintiff] in his profession."); *Joyce v. Thompson Wigdor & Gilly LLP*, 2008 WL 2329227, at *12, No. 06-cv-15315-RLC-GWG (S.D.N.Y. June 3, 2008) (report and recommendation) (false accusation that plaintiff lied about her health to avoid termination imputes dishonesty, which is incompatible with characteristics required for plaintiff's job); *Chiavarelli v. Williams*, 256 A.D.2d 111, 113 (1st Dep't 1998) (accusation of conduct that suggest plaintiff's unfitness for job is defamatory per se).

False statements published by a defendant which disparage a plaintiff in the performance of his or her official governmental duties are also defamatory per se. *Mencher v. Chesley*, 297 N.Y. 94, 100 (1947) ("A charge that a public official misused his position was guilty, in effect, of malfeasance in office is of course defamatory."); *Scacchetti v. Gannett Co., Inc.*, 90 A.D.2d 985, 985-986 (4th Dep't 1982) (article accusing a police officer of "spew[ing] obscenities about the

14

judge who sentenced his brother to federal prison ... tend[ed] to injure him in his profession as a law enforcement officer.").

Defendants apparently conflate defamatory connotations in a defamation per se claim with a claim for defamation by implication. "New York recognizes a distinction between a defamatory connotation from statements that are alleged to be expressly false and false suggestions, impressions and implications arising from otherwise truthful statements." *Goldfarb v. Channel One Russia*, 663 F.Supp.3d 280, 297 n.7 (S.D.N.Y. 2023) (quotation marks and alterations omitted). This distinction was determinative in *Armstrong*, where the New York Court of Appeals rejected a defense that a publication constituted defamation by implication and determined instead that it was reasonably susceptible to a defamatory connotation as defamation per se. "Rather, this is, as plaintiff insists, a case of allegedly false statements of verifiable fact, with inferences flowing from those facts, and he bears the burden of proving the alleged falsity as well as the other elements of his claim. Those standards are well established in our law." *Armstrong*, 85 N.Y.2d at 381. *See also Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir. 1997) ("Such **implications** … are statements that could convey a defamatory **connotation**.") (emphasis added).[12]

This distinction was also critical in *Davis v. Brown*, 211 A.D.3d 524, 525 (1st Dep't 2022), where a letter not defamatory on its face was nevertheless found to be reasonably susceptible to a defamatory connotation because of the context in which it was published. The letter accused plaintiff, a Dean of Graduate Studies at Fashion Institute of Technology, of being "culturally insensitive" in the presentation of a fashion show. Among other things, the letter falsely "implied

---

[12] Plaintiff does not seek to invoke defamation by implication because that claim applies to publications that are facially truthful but involve false suggestions, impressions, or implications. *Jacob v. Lorenz*, 626 F.Supp.3d 672, 694 (S.D.N.Y. 2022). Here, the conduct and words attributed to plaintiff in the publications and the fabricated text messages are all false. Libel *per quod* is addressed in Point III, below.

that plaintiff was responsible for the show, was aware of the accessories, could approve them, and failed to respond to student concerns." *Id*. at 526. As a result, the fair inference was that plaintiff was a racist.

Here, likewise, the inferences flowing from the facts falsely reported in the publications are easily discerned by the average reader: Plaintiff was characterized as a rogue law enforcement agent who engaged in unauthorized law enforcement work, and exerted his influence as a retired Secret Service agent to provide improper and surreptitious cover to benefit the Biden family.

### The Fabricated Text Messages

Other than to fit their narrative that the publications portray plaintiff as laudable crime fighter, defendants do not address the fabricated text message falsely attributed to plaintiff.

It is well-established that "[w]here, as here, an act of [ ] impersonation imputes facts to the person impersonated that damage him in his trade or profession, a cause of action for libel per se is adequately pleaded." *Rall v. Hellman*, 284 A.D.2d 113, 113 (1st Dep't 2001) (email falsely attributed to plaintiff but not about plaintiff that were not reflective of his views); *Lunney v. Prodigy Service Company*, 94 N.Y.2d 242, 248 (1999) (vulgar and threatening internet posts and email message falsely attributed to plaintiff but not about plaintiff were defamatory because they were ascribed to plaintiff); *Leser v. Penido*, 62 A.D.3d 510, 510 (1st Dep't 2009) (postings on internet falsely attributed to plaintiff were defamatory); *Yantha v. Omni Childhood Center, Inc.*, 2013 WL 5327516, at *5, No. 13-cv-1948-ARR-JMA (E.D.N.Y. Sept. 20, 2013) (healthcare reimbursement claims falsely attributed to plaintiff are defamatory); *Clevenger v. Baker Voorhis & Co.*, 8 N.Y.2d 187, 190 (1960) (well-known attorney-commentator on New York civil practice was falsely attributed with revisions to practice book which allegedly contained several errors); *Ben-Oliel v. Press Pub. Co.*, 251 N.Y. 250, 255 (1929) (false attribution of authorship of

16

newspaper article is defamatory).

The false attribution of the text messages to plaintiff falls squarely within the parameters of this controlling precedent. At a minimum, the fabricated text messages place plaintiff in a place where he was never assigned, to assist a person he had never met, and attribute a misuse of his authority when he was retired as a Secret Service agent. The fabricated text messages are themselves defamatory in isolation, but are even more emphatically defamatory in the context of the publications as a whole for the reasons set forth above.

\* \* \*

As the result of the foregoing, the publications are reasonably susceptible to a defamatory meaning(s).

## POINT III

## PLAINTIFF SHOULD BE GRANTED LEAVE TO AMEND THE COMPLAINT

Plaintiff submits that the allegations of the Complaint are sufficient to plausibly allege a claim of defamation per se without the need to plead extrinsic facts. *See Hinsdale v Orange County Publications, Inc.*, 17 N.Y.2d 284, 287-88 (1966) (publication of an engagement announcement between two persons widely known to be already married was libelous per se without necessity of special damages). Typical readers of the publications were extremely likely to be well aware of the widely reported publications of the fabricated text messages, which were also expressly quoted and depicted in the Tweets.

Even assuming, *arguendo*, that extrinsic facts relating to the previous publications of the fabricated text messages and their attribution to plaintiff are necessary to provide context for the defamatory connotations, plaintiff should be provided with leave to amend. Additionally, because sufficient allegations of special damages are required for libel per quod, *Henry v. Fox News*

17

*Network LLC*, 629 F.Supp.3d 136, 150-51 (S.D.N.Y 2022), leave should be provided to plaintiff to allege special damages as set forth in the accompanying Declaration of plaintiff Lorenzo Robert Savage III.

Also, in the event that the Court determines that it is not self-evident that the false reporting of plaintiff's misconduct as a rogue vigilante, who engaged in unauthorized law enforcement work, and provided improper and surreptitious cover to benefit the Biden family, are inimical to the business of a provider of security services, plaintiff requests leave to amend to set forth such allegations. (*See* Declaration of plaintiff Lorenzo Robert Savage III).

Fed. R. Civ. P. 15(a)(2) provides that "[t]he court should freely give leave when justice so requires." The decision to grant or deny leave "is within the sound discretion of the district court." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "Ordinarily a plaintiff should be granted leave to amend at least once after having the benefit of a court's reasoning in dismissing the complaint." *Obra Pia Ltd. v. Seagrape Investors LLC*, 2021 WL 1978545, at *3, No. 19-cv-7840-RA (S.D.N.Y. May 18, 2021). This is especially true on the Court's first ruling on a motion to dismiss. *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies."). The Court may deny leave to amend "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy*, 482 F.3d at 200.

Here, the additional allegations, if required to salvage plaintiff's claim for defamation, are not futile, in bad faith, unnecessarily delayed, or likely to result in any prejudice to the defendants.[13] Leave to amend should therefore be granted. *Winter v. Pinkins*, 2016 WL 1023319,

---

[13] Following the submission of pre-motion letters, the Court provided plaintiff with leave to amend

at *8, No. 14-cv-8817-RKS (S.D.N.Y March 8, 2016) ("Plaintiffs allegations for false light invasion of privacy and defamation, if augmented by Plaintiffs allegations regarding the location, timing, content, and viewership of Defendant's statements that were improperly made in his opposition brief, might amount to plausible claims.").

## **CONCLUSION**

For all of the above reasons, (i) the motion to dismiss should be denied in all respects; (ii) alternatively, plaintiff should be granted leave to file an amended complaint; and (iii) it is respectfully requested that the Court direct such other and further relief as it may deem just and proper.

Dated: Garden City, New York
          January 2, 2025

<div style="margin-left:50%">

Respectfully submitted,

Law Office of Mark E. Goidell
*Attorney for Plaintiff*

/s Mark E. Goidell
By: Mark E. Goidell
666 Old Country Road, Suite 700
Garden City, New York 11530
Tel. (516) 683-0001
mark@goidell.com

</div>

---

the Complaint "if … he can assert additional allegations to cure any alleged deficiencies **raised by defendants' letter**…" (emphasis added). [ECF 18, dated September 10, 2024]. Defendant's letter was limited to the contention that the Complaint was not reasonably susceptible to a defamatory meaning and did not raise libel per quod issues, although concededly, neither did the Complaint.

19