# Exhibit B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
LORENZO ROBERT SAVAGE III,

                                                 JURY TRIAL DEMANDED

Plaintiff,

                                                 Case No. 1:24-cv-3278

        -against-

NYP HOLDINGS, INC. d/b/a NEW YORK POST,    **[PROPOSED]    AMENDED**
MIRANDA DEVINE, and JONATHAN LEVINE,    **COMPLAINT**

Defendants.
------------------------------------------------------------------------X

Plaintiff **LORENZO ROBERT SAVAGE III** ("Plaintiff" or "Mr. Savage"), by his ~~attorney, Law Office of Mark E. Goidell, as and~~<u>attorneys,</u> for his Complaint against Defendants NYP HOLDINGS, INC~~.~~<u>.,</u> d/b/a New York Post, MIRANDA DEVINE, and JOHN LEVINE states and alleges the following:

**PRELIMINARY STATEMENT**

    <u>1.</u>    ~~Defendants falsely alleged that~~ Plaintiff<u>, is</u> a long-time and decorated special agent <u>previously</u> employed by the United States Secret Service ("USSS~~"), engaged in significant~~") who, <u>both with the USSS and currently in private employment as a security professional, adheres strictly to professional standards regarding chains of reporting for unlawful conduct by protectees; maintaining a nonpartisan stance (and avoiding any activities that may appear to be partisan); and avoiding off-duty personal contact or any other activities with a protectee outside the scope of his duties.</u>

    <u>2.</u>    <u>In or around 2020, a laptop of Hunter Biden surfaced, which Defendants claimed contained text messages sent to Hunter in May 2018 while he was engaging in illegal activities.</u>

3.      Plaintiff has never met or interacted with Hunter Biden, did not send the text messages at issue, and had no knowledge whatsoever of these events.

4.      Nonetheless, in an article in June 2021, Defendants published Plaintiff's name and image with these messages, attributing them to Plaintiff and suggesting that he deviated from professional standards expected of former agents of the USSS by assisting Hunter Biden to avoid a scandal for engaging in unlawful activities when there was no threat to Hunter Biden's physical safety.

5.      Plaintiff promptly reached out to Defendants to inform them that the text messages at issue were fabricated and/or not actually attributable to him, that he had no involvement in the events at issue, and that he had never met and had no relationship with Hunter Biden.

6.      A firestorm ensued.  Fox News covered Defendants' allegations, identifying Plaintiff by name and mocking him as a "Ray Donovan[1] Secret Service Fixer" with loyalties to the Biden family.  Within days, his then current employer received numerous complaints about Plaintiff, including messages that can only be described as hateful; and he learned that his colleagues were speaking about him with disappointment and distrust.  Senators, who were viable clients to whom Plaintiff could offer protective services as a private security officer, made inquiries with Plaintiff's agency regarding the alleged misconduct in the performance of his official duties by surreptitiously providing assistance to Hunter Biden, the son of President Joseph R. Biden, Jr., and covering.  Indeed, despite his adamant denial of any involvement whatsoever, an FBI and IRS agent later showed up the alleged misbehavior of unannounced and in person at Plaintiff's house,

_____

[1] Ray Donovan is a fictional character from a television series crime drama of the same name in which the main character is a professional "fixer" for celebrities who uses bribery, extreme physical violence, blackmail, computer hacking, and other illegal methods to clean up his clients' scandals.

to interrogate him about assumed dealings with Hunter Biden relating to drug abuse and patronizing prostitutes., a man he never met.

7. Distraught, Plaintiff repeatedly explained through counsel that Defendants' reporting was defamatory, untrue, and causing him actual harm.

1.8. But instead of correcting their error, Defendants doubled down. In supportSeptember 2023 Defendants revived their prior allegations against Plaintiff on Twitter and in a news article. Those publications revived the previous salacious allegations regarding Plaintiff and made it effectively impossible for anyone anywhere to run an online search or background check of these utterlyPlaintiff without coming across the damaging and false allegations, Defendants falsely reported that Plaintiff sent text messages to Hunter Biden, knowing or recklessly disregarding the obvious indicators that the text messages attributed to Plaintiff were fabricated.

2. Plaintiff is a dedicated husband and father of three. He is a 25-year veteran of the USSS. Beginning in 2015, Plaintiff served in the Senior Executive Service as the Special Agent in Charge of the USSS Los Angeles Field Office until November 2017. In that capacity, Plaintiff oversaw all Secret Service protective, investigative, and protective intelligence operations in which that office of the USSS was engaged.

3. Without regard to Plaintiff's well-being and well-earned reputation, Defendants published a false and malicious story alleging that fabricated text messages they attributed to Plaintiff were sent to Hunter Biden by Plaintiff, and then falsely reported that the text messages were found on the laptop belonging to Hunter Biden. Defendants reported false allegations regarding the fabricated text messages they attributed to Plaintiff, together with a falsified connection to the son of President Biden, to sensationalize their publications and sell newspapers.

~~4.       For almost three years, these Defendants and other media outlets with an apparent agenda have published false allegations about the Plaintiff. This action is brought to hold these Defendants accountable for their malicious, fabricated, and unscrupulous attacks on Plaintiff. Defendants' continued defamation must come to an end.~~

9.       As a result of the September 2023 defamatory reporting of Defendants, Plaintiff has suffered professional and reputational harm, including the actual loss of well over a million dollars in his private security business due to the partisan and unprofessional "stain" caused by the false rumors, as well as hundreds of thousands of dollars of monthly losses from specific contracts that were not obtained, as detailed below.

10.       Plaintiff brings this suit in hopes of clearing his name, restoring his professional ethical reputation, and recovering his losses from his wrongdoers.

**PARTIES**

~~5.~~11.    At all material times, Plaintiff was and is a resident of the State of California.

~~6.~~12.    Upon information and belief, Defendant NYP HOLDINGS, INC. d/b/a New York Post ("NYP") is a Delaware corporation doing business in and operating from its office located at 1211 Avenue of the Americas, New York, New York, and publishes a daily newspaper known as the New York Post, and owns, operates, and publishes articles and columns on its website, www.nypost.com.

~~7.~~13.    Upon information and belief, Defendant MIRANDA DEVINE ("Devine") is employed by NYP as a journalist, and resides in the State of New York. The NYP publishes articles authored by Devine, who also publishes posts from her Twitter (now known as "X") account, @mirandadevine.

~~8.~~14.    Upon information and belief, Defendant JOHN LEVINE ("Levine") is employed by NYP as a journalist, and resides in the State of New York.

## JURISDICTION AND VENUE

~~9.~~15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

~~10.~~16.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because NYP resides in this district and Devine and Levine, upon information and belief, are residents of the State of New York, and/or because a substantial part of the events, acts and/or omissions giving rise to this action occurred in this District, and/or because each Defendant has contacts within this judicial district that would be sufficient to subject it to personal jurisdiction if this district were a separate state.

## FACTS~~-~~

### *Facts Relating ~~To~~to Plaintiff*

~~11.~~17.  Plaintiff ~~Robert Savage~~ is a ~~dedicated~~trusted husband and father of three who has dedicated his life to serving and protecting the lives of others.

~~12.~~18.  Mr. Savage is a 25-year veteran of the USSS.  He began his Secret Service career in 1993 as a special agent assigned to the Washington, D.C. Field Office and steadily rose through the ranks.  He had a distinguished career, officially retiring in April ~~of~~ 2018.

~~13.~~19.  Mr. Savage received numerous awards during his exemplary tenure with the USSS. For example, Mr. Savage received: a Presidential Certificate of Appreciation in 2003 from President George W. Bush; the U.S. Department of Homeland Security Secretary's Award for excellence as the National Special Security Event Coordinator for the 2011 Asia-Pacific Economic Cooperation Leaders' Meeting comprised of 21 world leaders; the United States Secret Service Exemplary Performance Award 2004-2016; and a Congressional Certificate of Special Recognition by U.S. Representative Karen Bass in 2015.

14.20.  Mr. Savage's steady rise through USSS ranks saw his appointment to the title of Assistant to the Special Agent in Charge of the Presidential Protective Division in 2004, Assistant Special Agent in Charge of the Las Vegas Field Office in 2007, and in 2015, Mr. Savage was appointed to the Senior Executive Service as the Special Agent in Charge of the Los Angeles Field Office.  By coincidence only, Mr. Savage was exclusively assigned throughout his career to details with Republican officials.

15.21.  From 2015 until November 2017 until April 30, 2018, when Mr. Savage took a leave of absence in advance of his retirement to pursue ana private-sector employment opportunity, Mr. Savage led the USSS Los Angeles Field Office – the third largest of the Secret Service's 42 field offices. In that role, he successfully oversaw all Secret Service protective, investigative, and protective intelligence operations conducted by that office, including three resident offices located in Riverside, Santa Ana, and Ventura, California.

16.22.  During his leave of absence and since his retirement from the USSS, Plaintiff transitioned to the private sector and became the chief executive officer of a major private security company.

17.23.  Mr. Savage left his job as chief executive officer in 2022 and went on to found his own private security company, known as Savage III, Inc. ("Savage III").  Many of the clients he seeks to provide security to are U.S. Senators, Representatives and other similar protectees who do not receive USSS protection but need that equivalent service from the private sector.  Former USSS agents are the primary source of that equivalent service in the private sector.

***Standards of Conduct and Professionalism in the Security Industry, with Particular Focus on Standards of Former USSS Agents***

24.    Being an agent of the USSS is considered an elite and exceptional role in the security and protection industry.  Members of the USSS "must abide by the highest standards of

professional conduct, whether on duty or off duty,"[2] on top of the typical expectations of law enforcement officers to comply with the law, report illegal conduct, and exhibit responsibility and integrity.

25.    The USSS's standards include complying with a written conduct code as well as observing the highest standards of professionalism and nonpartisanship.  It is understood by all members of the USSS that they are expected to uphold this code both during and after their career, as the professional value of a former USSS agent flows from his exceptional character and high ethical and professional standards.

26.    USSS security professionals are expected to *never* exhibit personal partisanship or engage in any conduct suggesting they may favor a political party, as it is essential to ensure that all candidates and officials, on both sides of the aisle, feel equally safe and well-protected.  This gives their protectees confidence that they will be given the highest level of protection and service, regardless of the protectee's political affiliation or views.

27.    USSS agents are also held to the highest standards regarding inappropriate personal relationships.   USSS security professionals should *never* engage in "[s]ocial relationships/associations involve any contact beyond that reasonably necessary for the completion of an investigative mission or beyond that which is authorized. An employee can be disciplined for: 1) engaging in an improper personal relationship, or 2) engaging in unauthorized conduct that would cause the reasonably prudent person to believe that there is an improper relationship." (USSS Offense Code § 1.3).

---

[2] See U.S. Secret Service Fiscal Year 2015 Report to Congress: Professionalism Within the Workforce (July 17, 2015), available online at https://www.dhs.gov/sites/default/files/publications/United%20States%20Secret%20Service%20%28USSS%29%20-%20Professionalism%20within%20the%20Workforce.pdf

28.    The USSS Professionalism within the Workplace Manual further imposes penalties for:

(a)    Unprofessional Conduct (USSS Offense Code § 5.31) ("Engaging in conduct, while off duty, which dishonors, disgraces or discredits the USSS; seriously calls into question the judgment or character of the employee; or compromises the standing of the employee among his peers or his community.");

(b)    Misuse of Position (USSS Offense Code § 1.7) ("Exceeding the limits of USSS authority to further a personal, unofficial, or unauthorized interest; or using USSS position or affiliation for private gain or advantage"); and

(c)    Failure to Report Criminal Activity or Improper Intervention (USSS Offense Code § 1.2).

29.    Finally, federal law prohibits even some types of *conversations* between recently retired high-ranking USSS Agents and senior government officials, to avoid the appearance of impropriety.  *See* 18 U.S.C. § 207(c).  A recently retired official found in violation of this section may be subject to imprisonment as well as civil penalties and fines.  18 U.S.C. § 216.

30.    In addition to the USSS-specific expectations, all private security officers in California are expected to observe and report any violation of law.  In fact, a failure to report the commission of a crime to the appropriate channels can become a crime in itself.  *See* Cal. Penal Code §§ 31-32.

31.    USSS Agents are expected to abide by all these rules and norms while they are on active duty.  Further, these expectations follow an agent, such as Plaintiff, into retirement particularly where, as here, the former agent works in the private security industry.  Many politicians such as U.S. Senators and Representatives, who do not receive USSS protection, engage

former USSS agents as private security personnel to provide them with the same impeccable level of protection that USSS agents provide to, for example, the current President of the United States.

32.    In other words, a retired agent like Plaintiff who seeks employment providing protective services as a private security officer to Senators and Representatives is expected to follow the same standards and policies discussed *supra* that are applicable to active USSS agents. If they are perceived, rightly or wrongly, from deviating from those policies and standards, it will make it significantly more difficult for them to be retained as private security officers.

33.    Secret Service agents, like other federal law enforcement officers, are expected to operate at all times as non-partisan professionals, devoted to protect elected officials and other dignitaries in a solely professional capacity, and regardless of the protectees' political affiliation.

***False Reports Relating To̶to Plaintiff***

18.34.  In or about October 2020, articles began circulating in the media about a laptop purportedly belonging to Hunter Biden that was left at a computer repair shop in Delaware. Emails, photographs, and other content and files allegedly found on that laptop landed in the hands of the NYP.

19.35.  The electronic content found on the laptop purportedly included damning evidence of illegal activities engaged in by Hunter Biden.

20.36.  On October 14, 2020, NYP published the first of many stories about the recovery of the laptop and the information purportedly found on the device.

21.37.  The NYP alleged̶reported that the laptop provided a treasure trove of emails and photographs concerning Hunter Biden's personal and professional life.

22.38.  On June 22, 2021, the NYP published an article authored by Devine and Levine falsely reporting an exchange of text messages between Plaintiff and Hunter Biden in May 2018.

(messages Plaintiff never sent), and falsely alleging that Plaintiff intervened in extracting Hunter Biden from a compromising encounter with a prostitute.

23.39.  In the June 22, 2021 article, the NYP published an image of the fake text messages, supposedly recovered from the laptop, including the depiction of a photographic profile of Plaintiff associated with the text messages.  The NYP falsely reported that Plaintiff sent the text messages to Hunter Biden, and also falsely reported that Plaintiff's contact card, phone number, and USSS email address appeared on the laptop.

40.     These allegations, if true, would suggest multiple violations of USSS agents' codes of conduct and private security personnel ethics, including, but not limited to:

(a)     Unprofessional Conduct (USSS Offense Code 5.31) ("Engaging in conduct, while off duty, which dishonors, disgraces or discredits the USSS; seriously calls into question the judgment or character of the employee; or compromises the standing of the employee among his peers or his community.");

(b)     Misuse of Position (USSS Offense Code § 1.7) ("Exceeding the limits of USSS authority to further a personal, unofficial, or unauthorized interest; or using USSS position or affiliation for private gain or advantage");

(c)     Failure to Report Criminal Activity or Improper Intervention (USSS Offense Code § 1.2);

(d)     Improper Relationship (Offense Code § 1.3) (any contact beyond that reasonably necessary for the completion of a mission or what is authorized, or that would cause others to believe that there is an improper relationship); and/or

(e)     California Private Security Guard responsibilities to observe and report potential criminal activity.

41.    Moreover, these allegations suggested an inappropriate personal relationship and connection with the Biden family that would demonstrate a type of partisanship that is considered inappropriate and unprofessional in the USSS and in the security industry more widely.

42.    The fact that Plaintiff was then retired is of no significance because, as discussed *supra*, he is expected by his current and prospective protectees to adhere to the same standards as an active USSS agent.

43.    Based on media reaction, it is clear that the false depiction of Plaintiff was perceived as a serious breach of standards of conduct and ethics applicable to Plaintiff.

44.    Fox News, a news outlet with strong conservative viewership, covered Defendants' allegations, identifying Plaintiff by name and wrongly mocking him as a "Ray Donovan Secret Service Fixer" with loyalties to the Biden family and to Democrats.  In one popular Fox News program covering the allegations, Plaintiff's full name was shown on the screen, identifying him as a "former special agent" supposedly dispatched to the hotel to "save [Hunter Biden] from overcharges for a prostitute" made to his father's credit card.  During the program, then commentator and now Secretary Pete Hegseth and President Trump's daughter-in-law Lara Trump engaged in a critical discussion of the allegations and asked, "Is this what the Secret Service is supposed to do?" Lara responded, "I don't even think he was under Secret Service protection. Which begs a lot of different questions here. The answer's no."

45.    By June 23, 2021, Plaintiff's employer had received and alerted Plaintiff to numerous complaints, including messages such as: "Why you all protect the Biden Crime Family Syndicate, anyways?"; "Why would you be proud of being a "Fixer" for a paedophile. It would be honorable if you would come forward and tell all you know regarding the abuses and traitorous actions of Hunter Biden and the rest of the Biden family."; and "Why would any company hire

somebody that was the fixer of the Biden crime syndicate? Mr Savage swore a oath to this country not a criminal enterprise."

46.    Plaintiff also learned that his current and former colleagues were speaking about him with disappointment and distrust.

24.47.  Plaintiff, through his attorneys, promptly notified Defendants in June 2021 that the allegations set forth in the June 22, 2021 article concerning Plaintiff were false, that there were no text messages between Plaintiff and Hunter Biden, and that Plaintiff had no relationship whatsoever with Hunter Biden.

48.    TheIn or around July 2021, Plaintiff received a phone call from USSS Deputy Director Faron Paramore conveying Congressional inquiries from Senators Ron Johnson and Chuck Grassley regarding Plaintiff's alleged misconduct and abuse of position and potential involvement with the Hunter Biden scandal.  Paramore also told Plaintiff he had spoken to USSS Assistant Director Leon Newsome about the allegations.

49.    Indeed, despite his adamant denial of any involvement whatsoever, on March 3, 2022, an FBI and IRS agent showed up unannounced and in person at Plaintiff's house and served Plaintiff with a Grand Jury Subpoena regarding Hunter Biden. The agents specifically showed Plaintiff a photograph of the text messages published by Defendants, having wrongly believed the false reporting that Plaintiff had ties to Hunter Biden and potentially possessed information relevant to his business dealings.

50.    In order to avoid having to testify live at a Grand Jury proceeding, Plaintiff was required to provide the Department of Justice with a copy of his attorney's correspondence with the Defendants explaining and refuting their false reporting.

51.     Brad Maryman, the forensic expert and former FBI agent who authenticated the Hunter Biden laptop for the newspapers, if called to testify, will confirm that (1) at no time was he asked to confirm, nor did he ever corroborate Defendants' false claims about Plaintiff, and (2) his examination of the laptop's data did not reveal or confirm any specific material about Plaintiff on the laptop.

25.52.  There were more obvious indicators that the text messages were fabricated and not genuine include, including, but are not limited to, the following: (i) the text messages are time stamped May 24, 2018, almost a month after Plaintiff retired from the Secret Service; (ii) the telephone number associated with the fabricated texts was a one-use, VOIP number, and is not associated with Plaintiff, his family, or his business; (iii) the profile image/avatar of the purported sender of the messages was obviously copied and inserted into the fabricated exchange because, among other things, two-person text messages at that time did not depict a sender's profile image/avatar; (iv) the color of the "iMessage" falsely attributed to the sender of the messages to Plaintiff is green, which if genuine and authentic would have been depicted as blue and/or have the words "Text Message" or "Sent as Text Message" adjacent to the green messages; and (v) the content of aspects of the text messages differ in appearance from other versions of the fabricated text messages depicted in other publications.

53.     NeverthelessBy the time of her "Laptop From Hell" book's publication in November of 2021, Defendant Devine was admittedly aware of Plaintiff's objections to her inaccurate and defamatory reporting and was on legal notice of the falsity of the fake texts. In her retelling of the story that never happened, Devine told readers she would refer to Plaintiff only as "Rob" and would "not give his full name for legal reasons." Nevertheless, the book provided Plaintiff's personal retirement date for identification and repeated the suggestion that the extra-

duty escapade to the hotel was an unauthorized, and by implication improper, personal undertaking by the former Secret Service agent.

***Defendants Double Down on their Defamation—Now with Knowledge of Falsity***

26.54.  Despite being made aware that the allegations regarding Plaintiff were false, at no time did Defendants issue a retraction or correction.  Instead, on September 1, 2023, Devine posted a series of tweets from her Twitter account reviving the fabricated, non-existent text messages between Plaintiff and Hunter Biden, and portraying them as facts and news. Specifically, Devine, hawking her book with a link, alleged that the text messages were sent by Plaintiff during a 2018 drug and sex binge by Hunter Biden at a hotel. Devine detailed that when Hunter Biden attempted to pay a prostitute, he experienced issues with his debit cards and sought to use a card that is linked to President Biden. She falsely alleged that Plaintiff then appeared at the hotel: "there's a freshly retired Secret Service agent [Plaintiff] downstairs demanding that Hunter let him in." Devine then falsely reported a conversation between Plaintiff and Hunter Biden, and embedded within the story athe fake text message thread. As the text goes, Plaintiff allegedly implored and then directed Hunter Biden to let him into the hotel room so that Plaintiff could cover up Hunter Biden's indiscriminate acts. A copy of Devine's false and defamatory tweets (the "September 1, 2023 Tweets") is attached hereto as Exhibit A.

27.55.  On the following day, September 2, 2023, the NYP published a story co-authored by Devine and Levine in which Defendants repeat the false accusations set forth in the September 1, 2023 Tweets from the preceding day. The article headline reads, "Secret Service agent whose name appeared on Hunter Biden laptop bribed by Real Housewife: suit."

28.56.  Defendants thereby falsely allegedrealleged that Plaintiff was connected with the Hunter Biden laptop and theknowingly revived the allegations of misconduct falsely attributed to

Plaintiff that was widely and falsely reported in many publications in 2021.  Defendants recklessly and maliciously repeated the false allegations to impugn Plaintiff's reputation by depicting him as doing personal favors for then Vice President Joe Biden.

~~29.~~57.  In the September 2, 2023 article, Defendants ~~falsely alleged~~relied on their own knowingly false prior reporting to allege that Plaintiff "reportedly had ties to Hunter Biden," and ~~expressly and falsely alleged~~ that "[t]ext messages labeled as being from Robert Savage III were reportedly found on the first son's abandoned laptop."

~~30.~~58.  The article published on September 2, 2023 by Defendants (the "September 2, 2023 Article") was published in the NYP newspaper and on its website. A copy of the September 2, 2023 Article is annexed hereto as Exhibit B.

~~31.~~59.  Defendants purposefully posted the September 1, 2023 Tweets and published the September 2, 2023 Article which linked Plaintiff to the text messages purportedly found on Hunter Biden's laptop although they knew or recklessly disregarded that the texts were fictitious and fabricated, that Plaintiff had no connection to Hunter Biden, and that the conduct Defendants attribute to Plaintiff did not occur. The Tweets, which identified Plaintiff by name, directed readers to Devine's book – where the repeats the fictitious story in greater detail - reinforcing the false claims of Plaintiff's supposed ties to, and improper assistance to, Hunter Biden.

***The Fallout and Damage to Plaintiff's Business and Reputation***

60.    Because of Defendants' defamatory reporting, it has become functionally impossible to even do a simple Google search of Plaintiff without coming across the false and salacious allegations that Defendant has personal ties to the Biden family, has engaged in inappropriate and personal favors for the Biden family, or has violated his ethical and professional responsibilities.

61.    Indeed, the revival of the false allegations has caused Plaintiff's business real and specific financial harm in the form of lost business opportunities and revenue in excess of a million dollars.

62.    For example, in or around April 2023, Plaintiff was engaged in negotiations with Senator Sherrod Brown's Chief Operating Officer Kimberly Padilla regarding providing an ongoing security detail for Senator Brown's 2024 re-election campaign (and thereafter once he was in office).  Plaintiff sent a complete proposal to Ms. Padilla.

63.    After the September 1, 2023 Tweets and the September 2, 2023 Article came out, Plaintiff stopped hearing from Senator Brown's staff and learned from Matt Harrison (a Congressional Staffer) that the Brown Campaign had learned of the false Hunter Biden allegations published by Defendants on September 1 and 2, 2023 during the vetting process and had decided, based on those allegations, to select another security provider.

64.    If Plaintiff's business had received the contract as quoted, Plaintiff's business would expect to earn between $76,824 and $98,836 per month from the contract.

65.    Around the same time frame, Plaintiff was referred to the campaign of Senator John Tester of Montana and engaged in initial contact.  After the September 1, 2023 Tweets and the September 2, 2023 Article came out reviving the false allegations, Senator Tester's staff ceased contact and Plaintiff lost the opportunity for Senator Tester's business because of the false allegations published by Defendants.  Again, if Plaintiff's business had been hired by Senator Tester, Plaintiff's business would expect to earn between $76,824 and $98,836 per month from the contract.

66.    Finally, although Plaintiff's business has steadily grown in the years since its 2022 founding, with an anticipated eight figures of annual revenue this fiscal year, that growth has been

obviously stunted by the false allegations.  Because the false allegations have painted Plaintiff as a close friend of the Biden family who provides special assistance to Democrats, *since the September 2023 articles, none of Plaintiff's active political clients are Republicans.*  Based on information and belief, Defendants' false and defamatory depiction of Plaintiff as a rogue fixer for the Biden family created distrust of Plaintiff among a significant number of potential clients. Plaintiff's business has suffered lost work and revenue as a result.

67.    For example, since the release of the September 1, 2023 Tweets and the September 2, 2023 Article, Plaintiff's business has earned $464,349.08 from Democratic political clients. This number would be significantly higher in the absence of the false allegations, as more Democrats would be willing to work with Plaintiff, and Plaintiff would also have access to prospective clients who are Republican.   Based on the false information, Republicans who were willing to hire him in the past are no longer willing to use him to provide services.  Plaintiff estimates that he can show at least $1,393,047.24 in damages from these lost business opportunities.

68.    If the false allegations had not occurred staining Plaintiff's reputation with partisanship and unprofessional behavior, Plaintiff would be able to access a significantly larger pool of business, increasing the company's current earnings from political assignments.

69.    In addition to these harms Plaintiff has suffered reputational harm, embarrassment, emotional distress, loss of sleep, and significant weight gain from the stress, which has required medical treatment under the care of a doctor, including prescription medications which Plaintiff still takes on a regular basis.

70.    Defendants' recklessly false depiction of Plaintiff as detailed above, which Defendants have never adequately corrected, significantly damaged Plaintiffs' reputation within

his professional network and has limited referrals of potential business.  This injury has caused both personal stress and loss of income and is continuing in nature.

## CLAIM FOR RELIEF

### (Defamation)

~~32.~~71.  Plaintiff repeats, realleges, and incorporates by reference all allegations contained in the preceding paragraphs above as if fully set forth herein.

72.    To bring a claim for defamation in New York, Plaintiff must sufficiently allege that Defendants made a statement that was: (a) false, defamatory, and about Plaintiff; (b) published to a third party; (c) made with fault; and (d) must either constitute defamation *per se* or cause Plaintiff special harm. A defamatory meaning may be established *per se*, if it exposes Plaintiff to public hatred, ridicule, contempt, deprives Plaintiff of confidence and friendly intercourse in society, or disparages Plaintiff in his office, profession or trade.  Alternatively, a defamatory meaning may be established *per quod* if it communicates a defamatory idea in light of external factors.

~~33.~~73.  Defendants published or caused to be published the false and defamatory statements set forth above in the September 1, 2023 Tweets and the September 2, 2023 Article.  Those publications were made to third parties, and were false, defamatory, and about Plaintiff.

~~34.~~74.  In truth and in fact, Plaintiff did not send or receive any text messages to or from Hunter Biden.

~~35.    In truth and in fact, the text messages attributed to Plaintiff were fabricated and did not appear in nor were they retrieved from the laptop of Hunter Biden.~~

~~36.~~75.  In truth and in fact, Plaintiff had no connection to Hunter Biden.

37.76.  In truth and in fact, Plaintiff did not appear at the hotel where Hunter Biden was located, did not assist Hunter Biden, and did not engage in any conduct to cover up any misconduct engaged in by Hunter Biden.

38.77.  On their face, and/or in the exercise of reasonable diligence, it should have been readily apparent that the text messages published by Defendants were not genuine and were fabricated.

39.78.  ByIn addition, by letter from Plaintiff's attorney dated June 22, 2021, Defendants were provided with notice of the falsity of the allegations relating to Plaintiff set forth in the September 1, 2023 Tweets and the September 2, 2023 Article together with a demand to retract the false allegations, and failed to publish any retraction thereof. Instead, Defendants have amplified and reinvigorated coverage of the false allegations relating to Plaintiff in the September 1, 2023 Tweets and the September 2, 2023 Article.

40.79.  The September 1, 2023 Tweets and the September 2, 2023 Article were published with knowing falsity, or were published with reckless disregard for the truth, or the Defendants should have known in the exercise of reasonable diligence that the allegations relating to Plaintiff were false and that the text messages attributed to Plaintiff were fabricated.

41.80.  The September 1, 2023 Tweets and the September 2, 2023 Article constitute defamation *per se* because they tend to injure Mr. Savage in his trade, business, or profession and directly accuse Mr. Savage of abusing his position, or violating the code of conduct for current or former agents of the USSS; engaging in illegal misconduct, and potential violations of state or federal law applicable to former agents; covering up or providing inappropriate personal assistance to the Biden Family regarding the purported illicit activities of Hunter Biden, unfitness to perform the duties and responsibilities; demonstrating conduct unbefitting of his profession, including

improper partisanship and improper personal relationships, and the absence of responsibility and integrity in the discharge of his duties.  The articles further expose Plaintiff to public hatred, shame, ridicule, deprivation of confidence and friendly intercourse, by reviving and continuing to encourage the public to connect Plaintiff with scandalous and salacious allegations unbefitting of his character and wholly unrelated to him.  They tend to show that Plaintiff violated professional norms and ethics expected of a former USSS agent seeking employment as a private security officer.

81.    The September 1, 2023 Tweets and the September 2, 2023 Article also constitute defamation *per quod* because in light of the extrinsic facts and circumstances, the revival of the false allegations constituted defamation.  Specifically, the renewed allegations subjected Plaintiff to renewed public mockery, personal distress, and professional damage, more permanent and damaging than what Plaintiff had suffered when the 2021 articles first came out.  Indeed,  the natural effect of the revived false allegations on public search systems and algorithms has subjected him to a permanent and unavoidable stain to his reputation, falsely associating him with the Hunter Biden events, although he has no connection whatsoever to those events, and ensuring that he will never be able to avoid any connection to those allegations.

82.    Further, in the politically sensitive security industry, the revived allegations, which recirculated and made permanent and unavoidable the stain and rumors about Mr. Savage, Plaintiff's business suffered real and specific losses as a direct and proximate cause of Defendants' publications.  To be specific, his business lost two expected contracts with Senators Brown and Tester, which had been quoted at a rate of between $76,824 and $98,836 per month and would otherwise have been successfully obtained, and would remain a source of revenue today.  Further,

his business would be expected to have access to a larger pool of potential political clients, amounting to at least $1,393,047.24 in damages from these lost business opportunities.

42.83.  The September 1, 2023 Tweets and the September 2, 2023 Article have exposed Mr. Savage to hatred, contempt, ridicule, disgrace, and loss of business opportunities.

43.84.  The publication of the September 1, 2023 Tweets and the September 2, 2023 Article have caused significant damage to Plaintiff's reputation, humiliation, embarrassment, mental suffering, shame, emotional distress, and threats to his life, for which Plaintiff is entitled to an award of damages well in excess of $75,000.

44.85.  Additionally, Plaintiff has suffered substantial monetary damages because his business, Savage III, has been deprived of security contracts and business opportunities as a direct and proximate cause of Defendants' publications.

45.86.  Defendants published the September 1, 2023 Tweets and the September 2, 2023 Article knowing that they would sensationalize and enliven news coverage of Hunter Biden, creating more controversy and generating additional revenue and readership.

46.87.  Defendants engaged in knowing, intentional, willful, wanton, and malicious misconduct with the intent of harming Mr. Savage or in blatant disregard of the substantial likelihood of causing harm to Mr. Savage, thereby entitling Mr. Savage to an award of punitive damages in addition to compensatory damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against the Defendant as follows:

(a)    (a)    Awarding Plaintiff compensatory, special, and punitive damages in an amount to be determined at trial;

(b)    (b)    Awarding Plaintiff prejudgment interest;

(c)    ~~(c)~~    Awarding Plaintiff the costs of this action, together with his reasonable attorney's fees, expert fees, and the expenses and disbursements of this litigation; and

(d)    ~~(d)~~    Awarding such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a jury trial.

Dated: New York, New York
      October 17, 2025

*/s/ Jeffrey J. Chapman*
Jeffrey J. Chapman
MCGUIREWOODS LLP
1251 Avenue of the Americas, 20th Floor
New York, New York 10020
(212) 548-2100
jchapman@mcguirewoods.com

Samuel L. Tarry, Jr. *(pro hac vice forthcoming)*
MCGUIREWOODS LLP
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102
(703) 712-5425
starry@mcguirewoods.com

Juliet B. Clark *(pro hac vice forthcoming)*
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
(804) 775-4315
jbclark@mcguirewoods.com

*Counsel for Plaintiff*